UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JANE DOE,

                        Plaintiff,          Case No. 2:18-cv-11295
                                        Hon. Mark A. Goldsmith
vs.                                 Magistrate Judge: R. Steven Whalen

THE CITY OF DETROIT,
*a Michigan Municipal Corporation*,

                        Defendant.

_____/

| | |
|---|---|
| Carol A. Laughbaum (P41711) | Kevin J. Campbell (P66367) |
| Attorneys for Plaintiff | Monifa K. Gray (P69702) |
| STERLING ATTORNEYS AT LAW, P.C. | Luis E. Gomez (P80573) |
| 33 Bloomfield Hills Pkwy., Ste. 250 | Attorneys for Defendant |
| Bloomfield Hills, MI 48304 | THE ALLEN LAW GROUP, P.C. |
| (248) 644-1500 | 2500 W. Grand Blvd., Ste. 2500 |
| claughbaum@sterlingattorneys.com | Detroit, MI 48202 |
| | (313) 871-5500 |
| | kcampbell@alglawpc.com |
| | mgray@alglawpc.com |
| | lgomez@alglawpc.com |

_____/

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jane Doe, by her attorneys Sterling Attorneys at Law, P.C., moves this Court

pursuant to LR 7.1(h) to reconsider its Opinion and Order Granting Defendant's Motion for

Summary Judgment, and states:

1.      On February 19, 2020, this Court issued its Opinion and Order Granting Defendant's Motion for Summary Judgment (Dkt 47).

2.      As set forth in the accompanying Brief, reconsideration is required pursuant to LR 7.1(h) as palpable defect exists by which the Court and the parties have been misled, and correcting this defect will result in a different disposition of this case.

3.      The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter expressly denied concurrence.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order granting her Motion for Reconsideration, vacating its Opinion and Order Granting Defendant's Motion for Summary Judgment, vacating the Judgment entered, and restoring this case to the active docket.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:____/s/Carol A. Laughbaum_____
            Carol A. Laughbaum (P41711)
            Attorney for Plaintiff
            33 Bloomfield Hills Pkwy., Ste. 250
            Bloomfield Hills, MI 48304
            (248) 644-1500

Dated:  March 3, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JANE DOE,

                          Plaintiff,              Case No. 2:18-cv-11295
                                              Hon. Mark A. Goldsmith
vs.                                        Magistrate Judge: R. Steven Whalen

THE CITY OF DETROIT,
*a Michigan Municipal Corporation*,

                          Defendant.

_____/

| | |
|---|---|
| Carol A. Laughbaum (P41711) | Kevin J. Campbell (P66367) |
| Attorneys for Plaintiff | Monifa K. Gray (P69702) |
| STERLING ATTORNEYS AT LAW, P.C. | Luis E. Gomez (P80573) |
| 33 Bloomfield Hills Pkwy., Ste. 250 | Attorneys for Defendant |
| Bloomfield Hills, MI 48304 | THE ALLEN LAW GROUP, P.C. |
| (248) 644-1500 | 2500 W. Grand Blvd., Ste. 2500 |
| claughbaum@sterlingattorneys.com | Detroit, MI 48202 |
| | (313) 871-5500 |
| | kcampbell@alglawpc.com |
| | mgray@alglawpc.com |
| | lgomez@alglawpc.com |

_____/

**BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR RECONSIDERATION OF OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................ii-iii

STATEMENT OF ISSUE PRESENTED ...........................................................iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ...............................v

OVERVIEW ........................................................................................... 1

STANDARD OF REVIEW............................................................................ 3

LAW AND ANALYSIS................................................................................ 4

     I.    COUNT I and COUNT II:  Clear Error Exists with Respect to The Court's Finding that Defendant Took "Prompt Remedial Action" as Ample Evidence Exists from Which A Jury Could Conclude Defendant Failed to Take Timely Action to End the Harassment.................................................. 4

     II.   COUNT III:  Clear Error Exists with Respect to The Court's Finding that No Causal Connection Exists Linking Plaintiff's Protected Activity with (1) Denial of a Promotion and (2) Retaliatory Harassment by her Supervisors as Ample Evidence Exists from Which A Jury Could Conclude that Causal Connections Exist........................................................ 14

         A.    Retaliatory Failure to Promote ........................................... 14

         B.    Retaliatory Harassment ..................................................... 19

CONCLUSION AND RELIEF REQUESTED ....................................................... 21

# INDEX OF AUTHORITIES

## Case Law

*Bellamy v Fritz*, 129 F Appx 245 (6th Cir 2005)......................................................... 14

*Blankenship v Parke Care Centers, Inc*, 123 F3d 868 (6th Cir 1997) ......................... 14

*Chambers v Trettco*, 463 Mich 297; 614 NW2d 910 (2000) .......................................... 5

*Coley v Consolidated Rail Corp*, 561 F Supp 645 (ED MI 1982)................................... 5

*Collette v Stein-Mart, Inc*, 126 F Appx 678 (6th Cir 2005)................................... 5, 14

*Davis v Tri-State Mack Distributors*, 981 F2d 340 (8th Cir 1992) .............................. 12

EEOC v Avery Dennison Corp, 104 F3d 858 (6th Cir 1997) ..................................... 15

*EEOC v Rock-Tenn Services, Co*, Inc, 901 F Supp 2d 810 (ND Tex 2012) ................ 12

*Frazier v Richland Public Health*, 685 F Appx 443 (6th Cir 2017) .............................. 15

*Gilbert v Village of Cooperstown, NY*, 2011 WL 3516280, at *1 (NDNY 2011).................... 13

*Gorzynski v Jetblue Airways Corp*, 596 F3d 93 (2d Cir 2010)..................................... 13

*Halfacre v Home Depot, USA, Inc*, 221 F Appx 424 (6th Cir 2007)............................. 20

*Harrison v Metropolitan Gov't of Nashville*, 80 F3d 1107 (6th Cir 1996) .................... 19

*Hawkins v Anheuser-Busch, Inc*, 517 F2d 321 (6th Cir 2008)...................................... 4

*Hayes v Laroy Thomas, Inc*, No. 5:05CV195, 2007 WL 128287, at *20
  (ED Tex Jan. 11, 2007).................................................................................... 13

*Hayward v Cleveland Clinic Found*, 759 F3d 601 (CA 6, 2014) .................................... 1

*Houghtaling Bay Med Ctr*, 1997 WL 33353513 at *1 (Mich App 1997) ....................... 5

*Imwalle v Reliance Medical Prods, Inc*, 515 F3d 531 (6th Cir 2008)........................... 18

*In re Rodriguez*, 487 F3d 1001 (6th Cir 2007)......................................................15, 18

*Jackson v Quanex Corp*, 191 F3d 647 (6th Cir 1999) ................................................... 5

*Laster v City of Kalamazoo*, 746 F3d 714 (6th Cir 2014) ........................................... 20

*MacMillan v Millennium Broadway Hotel*, 2011 WL 4357523 at *5 (SDNY 2011).............. 13

*McDonnell-Douglas Corp v Green*, 411 US 792; 93 S Ct 1817 (1973) ....................... 14

*Meyer v City of Centerline*, 242 Mich App 560 (2000)............................................... 19

*Mich Dep't of Treasury v Michalec*, 181 F Supp 2d 731 (ED Mich 2002)...................... 3

*Moore v Kuka Welding*, 171 F3d 1073 (6th Cir 1999) ............................................... 18

*Morris v Oldham Cty Fiscal Ct*, 201 F3d 784 (6th Cir 2000)...................................... 19

*Pinney Dock & Transp Co v Penn Cent Corp*, 838 F2d 1445 (6th Cir 1988) ................ 1

*Radtke v Everett*, 422 Mich 368 (1993) ..................................................................... 4

*Sharp v Aker Plant Svcs Group, Inc*, 600 F Appx 337 (6th Cir 2015)......................... 19

*Singleton v Wolff*, 428 US 106; 96 S Ct 2868 (1976) ................................................. 1

*Spink-Krause v Medtronic, Inc*, 2017 WL 4778730, at*14-18 (ED MI 2017) .................. 18

*Sykes v Fed Ex Freight E*, 2019 WL 3530828, *4-5 (Mich App 2019) .......................... 5

*Taft Broad Co v United States,* 929 F2d 240 (6th Cir 1991)..................................... 4, 22

*Williams v General Motors Corp,* 187 F3d 553 (6th Cir 1999)...................................... 20

*Yuba Natural Res Inc v United States*, 904 F2d 1577 (Fed Cir 1990) ......................... 3

<u>Statutes, Court Rules, MIsc.</u>

FRE 801(d)(2)(d) ................................................................................... 18

ED MI LR 7.1(h)(3) ................................................................................. 3

M Civ JI 105.04A .................................................................................... 21

## STATEMENT OF ISSUE PRESENTED

Whether reconsideration of the Court's Opinion and Order Granting Defendant's Motion for Summary Judgment is required to prevent manifest injustice?

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Coley v Consolidated Rail Corp*, 561 F Supp 645 (ED MI 1982)
*Davis v Tri-State Mack Distributors*, 981 F2d 340 (8th Cir 1992)
EEOC v Avery Dennison Corp, 104 F3d 858 (6th Cir 1997)
*Hayward v Cleveland Clinic Found*, 759 F3d 601 (CA 6, 2014)
*In re Rodriguez*, 487 F3d 1001 (6th Cir 2007)
*Jackson v Quanex Corp*, 191 F3d 647 (6th Cir 1999)
*Meyer v City of Centerline*, 242 Mich App 560 (2000)
*Mich Dep't of Treasury v Michalec*, 181 F Supp 2d 731 (ED Mich 2002)
*Moore v Kuka Welding*, 171 F3d 1073 (6th Cir 1999)
*Morris v Oldham Cty Fiscal Ct*, 201 F3d 784 (6th Cir 2000)
*Spink-Krause v Medtronic, Inc*, 2017 WL 4778730, at*14-18 (ED MI 2017)
*Taft Broad Co v United States*, 929 F2d 240 (6th Cir 1991)

## OVERVIEW

In this sex discrimination/hostile work environment and retaliation case, the Court dismissed Plaintiff's claims, finding that she failed to present sufficient analysis to defeat Defendant's summary judgment motion. Specifically, the Court determined that it had not been presented with sufficient analysis to counter Defendant's claim that it took "prompt, remedial action" to effectively address Plaintiff's hostile work environment; or to counter Defendant's claim that no causal connection exists between Plaintiff's protected activity and the alleged retaliation (**Ex A**, Opinion and Order Granting Defendant's Motion for Summary Judgment).

Reconsideration is required pursuant to LR 7.1(h) with respect to these findings, as palpable defect exists by which the Court and the parties have been misled, and correcting the defect will result in a different disposition of this case. As a threshold matter, the Court's determination that Plaintiff's claims failed to survive summary judgment due to a lack of legal analysis reveals that the Court *was* misled. Even when a claim is deemed waived, however, this Court has discretion to deviate from the harsh rule of waiver to avoid manifest injustice. *Hayward v Cleveland Clinic Found*, 759 F3d 601, 615 (CA 6, 2014); *Singleton v Wolff,* 428 US 106, 121; 96 S Ct 2868, 2877 (1976); *Pinney Dock & Transp Co v Penn Cent Corp,* 838 F2d 1445, 1461 (6th Cir 1988). Plaintiff respectfully requests that the Court exercise that

discretion to reconsider its ruling, in light of the record as clarified below, to prevent manifest injustice.[1]

Further palpable defect, stemming from the Court being misled, is that the Court adopted Defendant's factual assertions with respect to "prompt, remedial action" including assertions with no factual support in the record. At the same time, the Court did not credit Plaintiff with key evidence that the City failed to take action and that in fact its *inaction* lead to an escalation of the harassment, including death threats against Plaintiff. These threats (May 2017) occurred five months *after* Defendant failed to act on Plaintiff's (December 2016) requests for a lock on her door and a camera to monitor her work area to catch her harasser, or take any other effective action. Even though Defendant has investigators and forensics experts at its disposal, it made no effort to involve the police for seven months (December 2016-July 2017), and did so only after Plaintiff's story and death threats received media coverage. Not only did DPD staff admit that Doe's complaints "slipped through the cracks," Police Sergeant Bolden testified that if the police had been involved from the start, it might have prevented an escalation of the threats against Doe. *Cites infra.* This alone is compelling evidence from which a jury could conclude that Defendant failed to take prompt, remedial

---

[1]Plaintiff's Counsel has been litigating employment cases for over 25 years, including trying a case in this Court, and has never had a case dismissed based on a finding of waiver. In her (32 page) SJ response brief, Plaintiff was attempting to, as concisely as possible, present her case without substantively repeating the numerous facts in the record she relied on, to counter the two legal arguments raised by Defendant. In that there was no oral argument, Plaintiff had no opportunity to respond to Defendant's 22-page reply brief, which included 10 additional pages of legal argument.

action to stop the harassment, and is only a portion of the evidence creating a jury question on that point.

Palpable defect also exists with respect to the Court's conclusion that Plaintiff's retaliation claims should be dismissed due to a lack of a causal connection between Plaintiff's protected activity and claimed retaliation, as the Court adopted Defendant's allegations on this point, while ignoring the contrary facts presented by Plaintiff which at a minimum, created a question of fact as to a causal connection (e.g., Doe's supervisor angrily accused Doe of throwing her "under the bus" in filing her second HR/CRIO complaint, and then marginalized Doe with a series of harassing acts, and then provided input to CFO Hill as to who should succeed her (retaliatory denial of promotion clam). *Cites infra.*

Plaintiff respectfully requests that the Court exercise its discretion to reconsider its ruling in light of the record as clarified below and required summary judgment standards.

## STANDARD OF REVIEW

U.S. District Court for the Eastern District of Michigan Local Rule 7.1(h) provides that a court will grant a motion for reconsideration if the moving party shows: (1) a palpable defect, (2) that misled the court and the parties, and (3) correcting the defect will result in a different disposition of the case. ED MI LR 7.1(h)(3). A palpable defect is a defect that is obvious, clear, unmistakable, manifest or plain. *Mich Dep't of Treasury v Michalec*, 181 F Supp 2d 731, 734 (ED Mich 2002). The decision whether to grant reconsideration lies largely within the discretion of the court. *Yuba Natural Res Inc v United States*, 904 F2d 1577, 1583 (Fed Cir 1990).

A court has discretion to review matters deemed waived to promote procedural efficiency and "where injustice ... might otherwise result." *Taft Broad Co v United States,* 929 F2d 240, 244 (6th Cir 1991)

## LAW AND ANALYSIS

I.   **COUNT I and COUNT II:  Clear Error Exists with Respect to The Court's Finding that Defendant Took "Prompt Remedial Action" as Ample Evidence Exists from Which A Jury Could Conclude Defendant Failed to Take Timely Action to End the Harassment**

Defendant's only challenge to Plaintiff's hostile work environment claims (Complaint Counts I, II[2]) is that Defendant took prompt, remedial action to stop the harassment directed at Doe.[3] *See Radtke v Everett,* 422 Mich 368, 396 and n 46 (1993) ("An employer may avoid liability if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment"). Prompt, remedial action is that which stops the abuse. *Hawkins v Anheuser Busch,* 517 F3d 321, 347 (6th Cir 2008). The inquiry is "whether the action reasonably served to prevent further harassment of the plaintiff."

---

[2] Count I of Plaintiff's Complaint alleges sex discrimination/hostile work environment (failure to conform to gender norms) in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act; Count II of Plaintiff's Complaint alleges sex discrimination/hostile work environment (transitioning and transgender status) in violation of those Acts (Dkt 1).

[3] A plaintiff establishes a prima facie case for hostile work environment under Title VII and ELCRA by showing (1) she belongs to a protected group; (2) she was subjected to communication or conduct on the basis of her protected status; (3) the communication or conduct was unwelcome; (4) the unwelcome conduct was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile or offensive work environment; and (5) the employer knew or should have known about the harassment but failed to take prompt, remedial action (or immediate and appropriate corrective action). *Radtke v Everett,* 422 Mich 368, 382 and n 46 (1993); *Hawkins v Anheuser-Busch, Inc,* 517 F2d 321, 333 (6th Cir 2008).

*Chambers v Trettco*, 463 Mich 297, 319; 614 NW2d 910 (2000). The critical test of whether the employer's corrective action was adequate is whether it stopped the harassment. *Collette v Stein-Mart, Inc*, 126 F Appx 678 (6th Cir 2005) citing *Houghtaling Bay Med Ctr*, 1997 WL 33353513 at *1 (Mich App 1997).

In addition, courts may hold an employer directly liable for co-worker harassment if its response "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Jackson v Quanex Corp*, 191 F3d at 647, 659 (6th Cir 1999), cited in *Sykes v Fed Ex Freight E*, 2019 WL 3530828, *4-5 (Mich App 2019).

The record in this case shows that Defendant's alleged investigation into the December 2016 incidents was minimal and ineffective. It is undisputed that those actions failed to stop the harassment directed against Doe; in fact, the harassment escalated. The record also shows that Defendant's alleged investigation into the May 2017 incidents was non-existent ("everybody was trying to keep this a secret"). It was not until *after* Plaintiff's story aired on Channel 7-WXYZ Detroit in July 2017 that the police finally became involved. But, given the time that had passed, they acknowledged there was very little if anything that could be done to catch Doe's harasser. A jury could easily find that not only did Defendant fail to promptly take action to stop the harassment, its agents evidenced callous indifference to it. *Quanex, Sykes, supra.*

Facts from which a jury could find that Defendant did not take prompt, remedial action to end the harassment include the following:

1.    Plaintiff documented the unfounded dress-code complaints, and promptly reported the 12/14/16 defaced name-plate and the 12/16/16 sex toy/disturbing note to her supervisor (Hughley) and HR. On 12/19/16, she filed a formal Discrimination and Harassment Complaint with the City's Human Rights Office, and that day specifically asked that a lock be placed on her door, and that a hidden camera be placed in her office, to try to catch the person responsible. She "never got a response back." Even though Ms. Kent (Human Rights) recommended to Hughley that a lock *should* be installed on Doe's door, it is undisputed that the City failed to install locks or a camera(s) until June 2017 (six months later), and only after Plaintiff received death threats related to her transition. (Dkt 39-40, PL's SJ Response: Ex K, 12/15/16 email; Ex E, 12/19/16 Complaint; Ex 1, Doe 26, 32-33, 36-37, 51-52, 113-114; Ex 7, Kent 11, 13, 25-26-55-56.)

2.    Doe was advised by Human Rights that the police would be involved. That did not occur until over seven months later (July 2017) after Doe's story (including death threats) was televised (Dkt 40: Ex 1, Doe 49, 70-71, 114, 117-118).

3.    With respect to the December 2016 incidents, Doe was informed that her co-workers were asked if they did it, and were asked to give hand-writing samples. Doe was told no one admitted to doing it, and they could not match the handwriting (Dkt 39, Ex B, Doe Decl ¶8).

4.    Defendant never had the handwriting samples professionally analyzed. Ms. Kent, who has no expertise in handwriting analysis, glanced at the samples to see if she saw

any similarities compared to the disturbing notes left for Doe. She did not, and concluded nothing from the exercise (Dkt 40: Ex 7, Kent 22-23; Ex 1, Doe 48-50).

5. From January – May 2017, Doe continued to ask when the promised lock on her door would be installed, and even offered to pay for it herself, which Hughley rejected. (Dkt 40: Ex 1, Doe 52-53).

6. There is no evidence in the record that the City enlisted building security, or Detroit Police Internal Affairs, nor involved the Police Department in any capacity until after Doe had received death threats and went to the media.

7. On May 8, 2017, Doe received the first of two death threats (… *they are to be put to death* …) which she reported, that day, to her supervisor and to the police (Dkt 39: Ex F; Ex G, 5/8/17 police report; Dkt 40: Ex 1, Doe 54).

8. The police informed Human Rights (Ms. Kent) that the threats against Doe were not a criminal matter, but an internal matter (Dkt 40: Ex 1, Doe 117-118; Ex I, last page).

9. Over Doe's fear for her safety and objections to returning to the workplace under the circumstances, Ms. Hughley required Doe to come back to work and told Doe that after she was back her safety concerns could be addressed, and that working from home temporarily was not an option (Dkt 39-40: Ex N, 5/10/17 emails; Ex 6, Hughley 92, 96; Ex 7, Kent 68; Ex 9, Parker 6).

10. On May 22, 2017, two weeks after Doe received the first death threat – which Defendant took no action to even attempt to address -- she received a second death threat

which had been place on the chair of her (unlocked) office (…You were warned! Now I will show you better than I can tell you. GOD HAVE MERCY ON YOUR SOUL!) (Dkt 39: Ex H).

11.     Doe continued to engage in protected activity (she immediately filed a second Human Rights complaint and an  EEOC/MDCR Charge of Discrimination) and continued to seek help, including  requesting to be moved to a different office, which was temporarily granted (Dkt 39-40: Ex 1, Doe 58, 60-61; EX I, 5/22/17 Human Rights Complaint; Ex O, 5/22/17 EEOC/MDCR Charge).

12.     Doe requested sensitivity training with respect to LGBTQ workplace issues; the training did not occur (Dkt 40: Ex 1, Doe 68; Ex 4, Dismuke 85-86).

13.     There is no evidence in the record of any follow up with staff after the two death threats; no one was asked if they saw or heard anything, nor were staff even informed that the notes had been left (Dkt 40:  Ex 1, Doe 120-122; Dkt 39, Ex B, Doe Decl. ¶3).

14.     Only after Doe's story appeared on Channel 7 (July 11, 2017) did Defendant's Police Department contact Doe, or follow up on the police report she had filed over two months earlier (Dkt 40: Ex 1, Doe 70-71).

15.     On July 12, 2017, a DPD police sergeant and Corporal Dani Woods (LGBTQ Police Liaison) phone Doe, apologized profusely for the delay and promised to take action, with Woods admitting things had "fallen through the cracks" and promising to send out an investigator to obtain statements and conduct an investigation (Dkt 40: Ex 1, Doe 71).

16.     Subsequently, DPD Sgt. Matthew Bolden came to Doe's office and took statements from Doe and others (Dkt 40: Ex 1, Doe 72-73; Ex 3, Bolden 35-36).

17.     Sgt Bolden agrees that Doe received death threats, that defacing her nameplate was a crime, and that the notes Doe received potentially constituted a hate crime (Ex 40:  Ex 3, Bolden 49-51).

18.     Hughley told Sgt. Bolden that locks had not been installed on Doe's door for months because building maintenance hadn't gotten around to it (Dkt 40: Ex 3, Bolden 31).

19.     Sgt. Bolden also asked Hughley why Doe had been moved back to her office when she had felt safe and comfortable on another floor; Hughley told him it was more conducive to business (Dkt 40: Ex 3, Bolden 32).

20.     Sgt. Bolden made a number of recommendations to the City regarding changes in the office space where the incident occurred which the City failed to implement (Dkt 40: Ex 1, Doe 74; Ex 3, Bolden 62-63).

21.     Sgt. Bolden testified that if the police had been involved from the start, it might have prevented an escalation of the threats against Doe (Dkt 40: Ex 3, Bolden 66-67, 89).

22.     Sgt. Bolden advised Doe that given the time that had passed, there was no way to obtain substantial proof as to the identity of her harasser, but that it was more than likely OGA Manager Charles Allen (Dkt 40: Ex 1, Doe 73; Ex 3, Bolden 55-56).

23.     Sgt. Bolden determined that the "access control" in OGM/OGA (Doe's floor) was poor, the swipe data was compromised, there was no viable surveillance footage, and given that months had passed, it would be difficult, if not impossible, to determine who had been in the office during the relevant time periods, let alone determine who was responsible (Dkt 40: Ex 3, Bolden 26-30, 52, 55-56).

24.    Bolden does not know if timely fingerprinting of the notes and sex toy by the DPD would have revealed useful evidence; it was not done. Polygraph testing was not considered, nor did DPD conduct any forensic handwriting analysis (Dkt 40: Ex 3, Bolden 57-59, 83).

25.    Mr. Allen's work computer was not searched (no warrant would have been required) nor was Allen asked if he was willing to have his home computer examined. *Id*, 65; 93-94.

26.    Bolden agreed that Allen was the "only suspect" (Dkt 40: Ex 3, Bolden 53-55).

27.    Allen has never been contacted by the police (Dkt 40: Ex 2, Allen 58-59; Ex 3, Bolden 35-36, 54, 60-61).

In its Opinion and Order, the Court found that the Defendant's  HR office (known as CRIO) *immediately began an investigation... sent out an email with the City's zero-tolerance policy, held a meeting where hand-writing samples were collected, and reminded employees that harassment is a terminable offense* (Opinion, p 3, 8). For these facts, the Court cited pp 48-51 of Doe's deposition testimony, as Defendant did in its Reply Brief (ECF No. 43, Reply to Facts item #24, Pg ID 2423).[4] However, Doe does not know what was done or not done (she was not at work during that time period) and her cited testimony either is based on what *she was told* had occured, or says no such thing (e.g., that City "reminded employees that harassment is a terminable offense"). Doe's cited testimony instead says that when she came

---

[4] These "facts" are also listed in Defendant's "Statement of Facts" (ECF 34, ¶33, 34, 35 at Page ID 1117), but Defendant either provided no citation to the record at all for these facts (¶33, 34) or a purported citation which says no such thing (¶35, citing n 31 – Doe's dep).

back to work in January 2017, she was told there had been some investigation done ("or what they called an investigation") which involved a meeting which (Doe was told) may have "scared" the person responsible, and that Doe learned a "zero tolerance" email had been sent out (Dkt 40: Ex 1, Doe, 48-51).

Ms. Parker, Doe's peer, shed further light on the referenced meeting. Staff from the Office of Grants Management where Doe worked (but not the adjoining Office of Grants Accounting, where Mr. Allen worked) convened in a conference room and Ms. Hughley relayed that "something [inappropriate] had happened [involving Doe], but not much more than that" (Dkt 40: Ex 9, Parker 11-13). And while Doe does not dispute that handwriting samples were collected, there was no effective follow-up (see ¶¶3, 4, 24, above). It is also beyond dispute that the handwriting sample exercise had zero deterrent effect on the harasser – his subsequent notes were typed.

Additionally, and as Doe reiterated at her deposition, any "investigation" pertained only to the first two (December 2016) incidents, not the May 2017 incidents:

> [By Doe] I wanted the City to actually call the police and let the police investigate because my understanding is that Lesa Kent is not an investigator. That is not her forte. Investigators go to school. They learn techniques. The other thing about investigations is they have to happen when the event happens. **Everybody was trying to keep this a secret.** Years have literally gone by. To try and investigate something that happened two years ago. I can barely recall some of this stuff let alone a witness who may have seen something. **There were no efforts after either of the notes to ask anybody if they saw anything. They didn't even tell the staff that the notes were left.** They kept it a secret, so if you were really trying to figure out who this person was, you would have told the staff, a dirty note was left. This is what it said. Did either of you see anything? Have either of you heard anything? They didn't do any of that.

Q:      [By Counsel for City] Wasn't that what that no zero-tolerance meeting was about?

A:      Absolutely, no. It was not. That zero-tolerance meeting was after the first incident. **After the two notes they didn't have any follow-up with staff after that. There were no staff meetings. There was no sensitivity training. Staff didn't even know that the two notes were left. Staff didn't even find out about that until I went on the news** and they said we didn't even know there were two other notes because they didn't share that with staff. They didn't ask them any questions…. [Y]et you tell me I have nothing to worry about and there's a man or a woman… who I think is Charles Allen… leaving these hateful threats against my life. But then I am expected to sit in this office as a sitting duck.

(ECF 40:  Ex 1, Doe 120-122)(emphasis added).

The Court's finding in its Opinion and Order that "it appears that every manager, and perhaps every employee, was made aware of the harassment" (Opinion p 8) is not supported.

Any reasonable jury could easily conclude from these facts that Defendant failed to take prompt, remedial action to end the harassment, and that the only reason the disturbing deliveries/ death threats eventually stopped had nothing to do with any "prompt remedial action" taken by Defendant, but was a function of Plaintiff going to the media.

*See also Davis v Tri-State Mack Distributors*, 981 F2d 340, 342-344 (8th Cir 1992) (agreeing employer failed to take prompt remedial action to address sexual harassment where the plaintiff complained several times over a six month period of time about continuing harassment, and despite employer making some "token efforts" to address the problem by meeting with employees to discuss sexual harassment and formulating an anti-harassment policy, with court agreeing the "company failed to appreciate the extent of the harassment and failed to take proper remedial measures"); *EEOC v Rock-Tenn Services, Co*, Inc, 901 F

Supp 2d 810, 827 (ND Tex 2012)(finding that whether company reasonably responded to recurring workplace racist graffiti presented a question of fact and precluded summary judgment, with court noting that while anonymous acts of harassment may present investigative difficulties, those difficulties at most present factual questions about the reasonableness of the employer's response, but are insufficient to support a finding that the employer acted reasonably as a matter of law); *Quanex, supra*, 191 F3d at 647 (reversing judgment for employer on hostile work environment claim, citing the employer's '"pattern of unresponsiveness" to the plaintiff's complaints); *Coley v Consolidated Rail Corp*, 561 F Supp 645 (ED MI 1982)(judgment for plaintiff given employer's failure to take prompt remedial action which permitted offensive work environment to continue); *Gorzynski v Jetblue Airways Corp,* 596 F3d 93, 103 (2d Cir 2010) (where only some, but not all, of the reported incidents of harassment  were met with prompt remedial action, a question of fact exists as to whether defendants met their burden and compels against summary judgment on the basis of that defense); *Gilbert v Village of Cooperstown, NY*, 2011 WL 3516280, at *1 (NDNY 2011)(same); *Hayes v Laroy Thomas, Inc,* No. 5:05CV195, 2007 WL 128287, at *20 (ED Tex Jan. 11, 2007)(any dispute regarding the adequacy of management's response is a factual issue for the jury); *MacMillan v Millennium Broadway Hotel*, 2011 WL 4357523 at *5 (SDNY 2011)(court noting that the promptness and adequacy of an employer's response to a hostile work environment claim is generally a question of fact for the jury; summary judgment denied).

The cases cited by Defendant in support of its "prompt remedial action" argument confirm the unremarkable proposition that an employer who effectively and very quickly

(within days) takes meaningful, corrective action can avoid liability. In *Bellamy v Fritz*, 129 F Appx 245 (6th Cir 2005), cited by Defendant, the court agreed that the employer took adequate (and successful) remedial action upon learning of the harassment by immediately counseling the harasser, and directing him to have no further contact with the plaintiff. In *Collette v Stein-Mart, Inc*, 126 F Appx 678 at *686 (6th Cir 2005), cited by Defendant, the court agreed that the employer took prompt remedial action when it immediately suspended the harasser pending investigation and terminated him six days later. *Collette* also cited additional case law for the proposition that a "three day delay" does not constitute an unreasonable failure to take prompt corrective action; and that a 10 day delay in granting an employee's request to be moved away from her harasser fell short of exhibiting indifference).[5]

II.    **COUNT III:   Clear Error Exists with Respect to The Court's Finding that No Causal Connection Exists Linking Plaintiff's Protected Activity with (1) Denial of a Promotion and (2) Retaliatory Harassment by her Supervisors as Ample Evidence Exists from Which A Jury Could Conclude that Causal Connections Exist**

A.    **Retaliatory Failure to Promote**

Both Title VII and the ELCRA prohibit retaliation against an employee who has engaged in protected conduct under the statute. Absent direct evidence, retaliation claims under Title VII and the ELCRA are analyzed similarly under the familiar *McDonnell Douglas*[6] burden-shifting paradigm. A plaintiff alleging retaliation in violation of the ELCRA or Title VII must establish the following elements of a prima facie case: 1) the plaintiff engaged in

---

[5] *Blankenship v Parke Care Centers, Inc*, 123 F3d 868 (6th Cir 1997), cited by Defendant, was abrogated in *Collette, supra.*

[6] *McDonnell-Douglas Corp v Green*, 411 US 792, 93 S Ct 1817 (1973).

protected conduct; 2) that this was known by the defendant; 3) that the defendant took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action. *See In re Rodriguez*, 487 F3d 1001, 1011 (6th Cir 2007); *Frazier v Richland Public Health*, 685 F Appx 443, 450 (6th Cir 2017). The "burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *EEOC v Avery Dennison Corp*, 104 F3d 858, 861 (6th Cir 1997).

Defendant's challenge to Plaintiff's retaliation claims (Count III)[7] is that no causal connection exists (element 4) between Plaintiff's discrimination/harassment complaints, and the alleged retaliation (retaliatory failure to promote; retaliatory harassment). Defendant also arguably challenges whether Plaintiff suffered any adverse action (with respect to retaliatory harassment, discussed below).

To establish a causal connection between the protected activity and the adverse employment action (here, denying Plaintiff a promotion to Director of Grants), a plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *In re Rodriguez*, 487 F3d at 1011; *see also EEOC v Avery Dennison Corp*, 104 F3d at 861 ("At the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity").

---

[7] Count III of Plaintiff's Complaint alleges retaliation in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act (Dkt 1).

The facts from which a jury could easily find a causal connection between Doe's protected activity (December 2016 through July 2017) and Defendant's failure to promote her to Director or Grants (October 2017 and continuing) include:

1. Hughley admonished Doe for "throwing me under the bus" in Doe's May 2017 Human Rights Complaint, which Hughley admits (Dkt 40: Ex 1, Doe 62, Ex 6, Hughley 62-63, 70, 90-92; Ex P, 2nd HR Complaint).

2. Subsequently, Hughley became increasingly unpleasant and even hostile toward Doe, including: Hughley unapproved Doe's vacation request - the morning after Doe met with HR to discuss Hughley's "threw me under the bus comment" - after Hughley had just approved the vacation request in writing; Hughley had Doe's new office on another floor cleared out, and relocated Doe back down to her old office (same floor as Mr. Allen) against Doe's wishes, without explanation; Hughley nit-picked Doe over meetings that should have taken place, or meetings that should not have taken place; Hughley over scrutinized Doe's leave time, although approved by the Mayor's office; Hughley placed Doe on an "attendance control" program; Hughley, almost daily, took issue with Doe over matters that had never before been an issue (Dkt 40: Ex 1, Doe 60-61, 63-64, 78-79; Ex J, emails).

3. Hughley admits she was disappointed with Doe after reading her Human Rights Complaint (Dkt 40: Ex 6, Hughley 64).

4. Doe had many discussions and emails with Human Rights and Human Resources regarding Hughley's change in attitude towards her following the "threw me under the bus" exchange (Dkt 40: Ex 1, Doe 62-63 and, *e.g.*, Ex Q, 6/23/17 email to Dismuke).

5.      Hughley admits that prior to leaving the City she discussed with CFO Hill (who Defendant identifies as the decision-maker) who she thought should succeed her as Director of Grants (and she did not recommend Doe) (Dkt 40: Ex 6, Hughley 27-30, 35).[8]

6.      Overwhelming  evidence  of  Doe's  qualifications  and  superior  credentials (compared to Ms. Bounds) to assume Hughley's former position of Director of Grants exists: Doe was the longest serving Assistant Director of Grants, Doe wrote most of the policies and procedures  for  the  office  and  was  the  only  manager  with  historical  knowledge  of  the department; Doe had effectively filled the role of a former outgoing Deputy Director of Grants Management; as AD, Hughley had Doe cover high level meetings in Hughley's absence; Ms. Bounds  did  not  have  Doe's  educational  credentials;  Bounds  lacked  Doe's  experience managing OGM staff; Doe had to train Bounds after Bounds assumed the role over Doe; Bounds was not familiar with HUD grants which account for a large share of the City's grant funding, while Doe had extensive HUD experience; and various City executives congratulated Doe on her impending promotion to Hughley's former position, as though her selection was a no-brainer. (Dkt 40: Ex 1, Doe 82, 89-90,99; Dkt 39: Ex B, Doe Decl ¶12).

7.      June Foster, an administrative assistant to both Doe and Hughley, told Doe that Hughley stated if Doe did *not* get Hughley's job, it would be due to Doe's discrimination

---

[8] The fact that Hughley accurately assessed Doe's performance, giving Doe a favorable performance review just prior to Hughley's abrupt departure from the City (Dkt 40: Ex 1, Doe 80; Ex 6, Hughley 11-13) does not require the conclusion that Hughley could not have retaliated against Doe in other ways.

complaints (Dkt 40: Ex 1, Doe 90; Ex 5, Foster 19-21) (Foster did not specifically recall, but did not deny, hearing this from Hughley).[9]

8.     The Controller informed Plaintiff that CFO Hill had shot down any possibility of Doe receiving a different position (Director of Compliance, reporting to the Controller) (Dkt 40: Ex 1, Doe 93, 95).

Under the case law, these facts clearly support the required causal connection. Evidence that the plaintiff experienced a retaliatory atmosphere after making a complaint has been found to support an inference of retaliation for purposes of the required causal connection. *See, e.g., Imwalle v Reliance Medical Prods, Inc*, 515 F3d 531, 550-51 (6th Cir 2008); *Spink-Krause v Medtronic, Inc*, 2017 WL 4778730, at*14-18 (ED MI 2017)(11 month gap between protected activity and termination coupled with other evidence, including supervisor admonishing plaintiff for HR complaints because they made supervisor "look bad" and otherwise marginalizing plaintiff with respect to his job, sufficient to  infer causal connection, denying summary judgment to employer); *In re Rodriguez, supra,* 487 F3d at 1011 (Sixth Circuit agreeing that one way of presenting circumstantial evidence of retaliation is by showing that the plaintiff was treated differently before and after having engaged in the protected activity);*Moore v Kuka Welding*, 171 F3d 1073 (6th Cir 1999)(the plaintiff's increased isolation after filing EEOC complaint, more frequent disciplinary write-ups of plaintiff for trivial matters and unwarranted criticism of plaintiff's work, when viewed as a whole, supported the

---

[9] Hughley's and Foster's statements were both made by a party's agent or employee on a matter within the scope of that relationship and while it existed, and thus are <u>not</u> hearsay. FRE 801(d)(2)(d).

jury's finding that the defendant retaliated against the plaintiff for engaging in protected activity); *Harrison v Metropolitan Gov't of Nashville*, 80 F3d 1107, 1199 (6th Cir 1996)(15 month period of time between protected activity and termination, with evidence that the plaintiff's activities were scrutinized more closely than those of comparably situated employees… is evidence supporting a finding of retaliation as is the record in this case which reveals an atmosphere in which … defendants took every opportunity to make [plaintiff's] his life as an employee unpleasant…is evidence supporting a finding of retaliation); *Sharp v Aker Plant Svcs Group, Inc,* 600 F Appx 337 (6th Cir 2015)(reversing summary judgment to employer, 15 months between protected activity and termination, coupled with other evidence of retaliation sufficient)

B.      Retaliatory Harassment

Retaliatory harassment is also prohibited under Title VII and Michigan's ELCRA. *See Morris v Oldham Cty Fiscal Ct,* 201 F3d 784, 792 (6th Cir 2000) (third element of *prima facie* retaliation case requires a showing that the defendant took adverse action against the plaintiff *or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor* after having engaged in protected activity); *Meyer v City of Centerline*, 242 Mich App 560 (2000).

In addition, the Sixth Circuit has stressed that in analyzing the significance of any given act of retaliation, not only does context matter, but the retaliatory events alleged must be viewed not in isolation, but as a whole. The proper analysis is whether, given the totality of the evidence, whether the "constellation of surrounding circumstances, expectations, and

19

relationships" formed a hostile or abusive workplace environment from both an objective and a subjective perspective." *Williams v General Motors Corp,* 187 F3d 553, 562 (6th Cir 1999). "An act that would be immaterial in some situations is material in others. This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context…" *Laster v City of Kalamazoo*, 746 F3d 714, 731-732 (6th Cir 2014); *see also Halfacre v Home Depot, USA, Inc,* 221 F Appx 424, 432 (6th Cir 2007) (remanding for reconsideration … whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim)." *Laster,* 746 F3d at 731 (additional citations omitted).

Facts from which a jury could find a causal connection between Doe's protected activity and retaliatory harassment by Hughley and Bounds includes, <u>as to Ms. Hughley</u>, items 1-4 in the preceding section.

Facts from which a jury could find a causal connection between Plaintiff's protected activity and retaliatory harassment includes, <u>as to Ms. Bounds</u>:

1.      Ms. Bounds was aware of Doe's discrimination complaints (Dkt 40: Ex 1, Doe 131-132) (*From my understanding of what she [Bounds] said, she was aware of it [my harassment complaints against the OCFO, where she now works]*).

2.      Ms. Bounds - to whom Doe reported after Bounds was promoted to Director of Grants over Doe  - has marginalized and harassed her by stripping Doe of key staff, unlike any other AD reporting to Bounds; showing up at meetings Doe was covering, minimizing Doe's role; giving Doe write-ups over non-issues including alleged failure to give a former AD

notice of weekly, calendared standing meetings; nit-picking and criticizing meeting minutes taken by Doe or her designee as lacking detail or being *too detailed;* accusing Doe of stealing time when Bounds/her secretary failed to properly record a sick day taken by Doe; and giving Doe an abysmal review, unlike any Doe has received in her career, and which is both polar opposite of the very positive review Doe received a year earlier from Hughley and contrary to the stellar feedback from the Directors Doe works with, and Doe's direct reports (Dkt 40: Ex 1, Doe 104-111, 122, 125, 131-132, 135-141; Ex 9, Parker 23-25; Ex V, October 2017 review; Ex W, October 2018 review; Ex X, Support letters).

3.　　Doe testified that she has been treated as though she is a troublemaker with no options to move or advance with Defendant (Dkt 40: Ex 1, Doe 93-96).

*See also* M Civ JI 105.04A, the standard Michigan jury instruction setting forth the burden of proof in a retaliation claim, and providing that a plaintiff establishes the requisite causal connection by demonstrating that her protected activity was a significant factor in the defendant's adverse employment action.

## CONCLUSION AND RELIEF REQUESTED

As set forth above, this case presents genuine issues of material fact as to whether Defendant took "prompt remedial action" to address the harassment directed at Plaintiff, as is required (Count I, Count II); and genuine issues of material fact as to whether or not a causal connection exists between Plaintiff's protected activity (discrimination and harassment complaints) and the alleged retaliation (failure to promote, retaliatory harassment).

Reconsideration is truly required in this case to prevent manifest injustice. *Taft Broad Co v United States,* 929 F2d 240, 244 (6th Cir 1991).

Plaintiff respectfully requests an Order granting her motion for reconsideration, vacating its Opinion and Order Granting Defendant's Motion for Summary Judgment, vacating the Judgment, and restoring this case to the active docket.

PROOF OF SERVICE

I certify that on March 4, 2020, I filed the foregoing paper with the Clerk of the Court using the ECF system, which will electronically send notification to all counsel of record.

/s/Carol A. Laughbaum
Sterling Attorneys at Law, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
claughbaum@sterlingattorneys.com

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:   /s/Carol A. Laughbaum
          Carol A. Laughbaum (P41711)
          Attorney for Plaintiff
          33 Bloomfield Hills Pkwy., Ste. 250
          Bloomfield Hills, MI 48304
          (248) 644-1500

## CERTIFICATION UNDER E.D. MICH. LR 5.1(a)

I, Carol A. Laughbaum, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10 ½ characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

/s/Carol A. Laughbaum
